NEW VISION PHOTOGRAPHY
PROGRAM, INC., *et al.*,

      Plaintiffs,

      v.

                      Civil Action No. 13-1986 (JEB)

DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

## MEMORANDUM OPINION

As part of its Medicaid program, the District of Columbia provides an array of services designed to help adults with intellectual disabilities live in the community and avoid institutionalization. To offer those services, the District contracts with providers such as Plaintiff New Vision Photography Program, Inc. When New Vision failed its annual Provider Certification Review, however, the D.C. Department of Health Care Finance moved to terminate its Provider Agreement, and the Department of Disability Services froze new referrals to the program. New Vision and its owner, Plaintiff Albert Price, then pursued redress through the administrative channels provided by District law. Although their administrative appeal was still pending, Plaintiffs also brought this suit alleging violations of the Age Discrimination in Employment Act, deprivation of their Fifth Amendment right to due process, and contravention of various state laws. Plaintiffs named as Defendants both the District and two DDS employees, Cathy Anderson and Sherin Moses.

After weathering Plaintiffs' unsuccessful attempt to obtain a temporary restraining order, Defendants moved for dismissal, arguing that the federal causes of action in the First Amended Complaint fail to state a claim and that the Court lacks subject-matter jurisdiction over the state

ones.  Before the Court could rule on that motion, Plaintiffs sought leave to file a Second Amended Complaint.  Defendants oppose the proposed amendment on futility grounds, arguing that even with the additions, this newest Complaint remains infirm.

While Plaintiffs may feel aggrieved by their contract's termination, intensity of emotion is no substitute for pleading facts adequate to state a claim.  Even the proposed Second Amended Complaint, an improvement over earlier versions, is cobbled together out of mismatched elements of various constitutional doctrines that together do not add up to any actionable claim.  Because of Plaintiffs' continued failure to allege facts sufficient to support any federal cause of action, the Court must deny leave to amend.  It will dismiss the federal counts and permit Plaintiffs to take their state claims to the District of Columbia Superior Court, should they so desire.

## I.     Background

### A.     Medicaid

To provide some much-needed context for these claims, a brief primer on the District of Columbia's Medicaid program may prove helpful.  "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  Wilder v. Va. Hosp. Assn, 496 U.S. 498, 502 (1990) (citing 42 U.S.C. § 1396).  Unlike Medicare, Medicaid is a public-assistance or "welfare" program, not insurance.  See Patchogue Nursing Center v. Bowen, 797 F.2d 1137, 1140-41 (2d Cir. 1986).  In operation, states (and the District) pay approved healthcare providers directly for a range of services to low-income individuals, and the federal government reimburses them for a share of those expenditures.  See D.C. Hosp. Ass'n v. District of Columbia, 224 F.3d 776, 777 (D.C. Cir. 2000).

State participation in Medicaid is voluntary, but to qualify for federal funding a state must first have its Medicaid plan approved by the federal government.  See Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 433 (2004).  Once in the program, in order to receive federal reimbursement, a state must comply with the requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services.  See U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc., 778 F. Supp. 2d 37, 40 (D.D.C. 2011).

Medicaid services, as a general rule, must be provided in a clinical setting.  States, however, can request a waiver, known as a Home and Community-Based Services (HCBS) waiver, to allow for "payment for part or all of the cost of home or community-based services." 42 U.S.C. § 1396n(c).  The waiver is an agreement between the state and federal governments that allows the state to spend Medicaid funds on care that would otherwise be ineligible for coverage.  Id.  The waiver is the exception, not the rule, and as such it is highly restrictive; for example, the waiver authorizing the services New Vision provides is 169 pages in length.  See District of Columbia's Home and Community Based Services Waiver for the Mentally Retarded and Developmentally Disabled, CMS Control #0307.90.R1, available at http://goo.gl/v3B2mw.

Pursuant to its HCBS waiver, the District furnishes an array of services to allow intellectually disabled adults to live in the community and avoid institutionalization.  The waiver program is operated by the Department of Disability Services under the supervision of the D.C. Department of Health Care Finance.  See D.C. Mun. Regs. tit. 29, § 1900.3.  DDS is responsible for the District's efforts to reform and regulate the care and habilitation services provided to residents with intellectual and developmental disabilities.  See D.C. Code §§ 7-761.03, 7-761.04(b).  To accomplish this, DDS is empowered to "[e]stablish rules, quality standards, and policies for Medicaid funded services," and to "monitor the provision of all services . . . and

investigate, remediate, and enforce quality standards for all services" in the District. Id. §§ 7-761.05(3), 7-761.05(5).

In the District, waiver providers must meet an extensive list of qualifications, which includes the requirement that they "[c]omply with all applicable District of Columbia licensure requirements" and "[e]nsure compliance with the provider agency's policies and procedures and DDS policies." D.C. Mun. Regs. tit.29, §§ 1904.4(d), (k). DDS oversight is a core component of the waiver program; indeed, the federal provision authorizing the HCBS waiver specifies that "[a] waiver shall not be granted under this subsection unless the State provides [satisfactory] assurances . . . that . . . necessary safeguards (including adequate standards for provider participation) have been taken to protect . . . individuals provided services under the waiver." 42 U.S.C. § 1396n(c)(2)(A). The federal government also retains the right to terminate a state program that fails to adequately oversee its providers. See Health & Human Servs. Office of Inspector General, OEI-02-08-00170, Oversight of Quality of Care in Medicaid Home and Community-Based Services Waiver Programs 6 (2012) (citing 42 CFR § 441.304(d)).

B.     Factual Background

For purposes of these Motions, the Court will take as true the facts from Plaintiffs' proposed Second Amended Complaint. According to that pleading, this suit arose from the acrimonious conflict surrounding the termination of New Vision's Medicaid Provider Agreement, which has formed the core of its business for over ten years. See 2d Am. Compl., ¶¶ 3, 7. Plaintiffs have pursued redress on two fronts — in this Court and, as provided by District law, in D.C.'s Office of Administrative Hearings. See id., ¶ 12. At the time this suit was filed, the OAH proceeding was still underway, but Administrative Law Judge Mary Masulla has since rendered a verdict, of which the Court takes judicial notice, and which offers some useful history

for this case.  See New Vision Photography Program (New Vision - OAH), No. 2013-DHCF-175 (OAH May 20, 2014).

New Vision Photography Program is a Maryland corporation that provides pre-vocational training programs for intellectually disabled adults.  See 2d Am. Compl., ¶ 7.  As its name suggests, New Vision's training programs focus on preparation for jobs in photography, such as working on one-hour photo-developing machines, producing photo-I.D. cards, and photographing small events.  See New Vision - OAH, No. 2013-DHCF-175, at 4.  It also provides instruction in general employment skills and offers job-placement services for program participants.  See id.  Plaintiff Price, although suing in his capacity as "Service Provider," is "Founder/President & CEO" of New Vision.  See, e.g., 2d Am. Compl. Caption; Am. Compl., Exh. 2 (Affidavit of Albert Price) at 1.

In 2003 New Vision entered into a Medicaid Provider Agreement with the District of Columbia, allowing it to receive reimbursement for vocational services rendered to HCBS waiver beneficiaries.  See 2d Am. Compl., ¶ 7; see also New Vision - OAH, No. 2013-DHCF-175, at 4.  In 2007, the District received approval from the federal government to offer expanded wellness services to HCBS waiver beneficiaries, which are outside the scope of what is typically permissible under the regular waiver program.  See 54 D.C. Reg. 12,381 (Dec. 21, 2007); 55 D.C. Reg. 2,906 (March 21, 2008).  By December 2009, New Vision was authorized through this program to provide fitness training to some of its Medicaid clients in addition to vocational services.  See 2d Am. Compl., ¶¶ 27-28.

The fitness opportunity did not last long.  In September 2011, Plaintiffs allege that a DDS employee, not party to this suit, verbally informed Price that "[New Vision] was being terminated due to DDS Medicaid Waiver [no longer] funding [New Vision] Professional (Fitness Training)."  Price Aff. at 1.  At the time, New Vision allegedly received no documentation of the

reason for this action.  See id.  Later, in July 2013, however, New Vision did receive a letter

from DHCF informing it that a desk audit had determined that New Vision had billed in excess

of annual limits for these services, and that the city would seek reimbursement of $16,686.92.

See Am. Compl., Exh. 4 (Proposed Notice of Medicaid Overpayment Recovery) at 1.  Since

September 2011, New Vision's program participants, who had previously received fitness

training from the company, have allegedly participated in a similar program administered by

"OJI Fit."  See 2d Am. Compl., ¶ 29.  This, Plaintiffs claim, has caused New Vision to lose

$240,000 in revenue over the last three years.  See id., ¶ 28.

Although no longer providing fitness training after September 2011, New Vision continued

to offer vocational services through the HCBS waiver.  See 2d Am. Compl., ¶¶ 12, 28.  In

August 2012, however, New Vision ran into trouble when it failed its annual Provider

Certification Review (PCR).  See Surreply, Exh. B (DDS/DDA Do Not Refer List – March 10,

2014) at 4; see also Proposed Notice at 1; New Vision-OAH, No. 2013-DHCF-175, at 8-9. [1]

DDS notified New Vision of its failure in September 2012 and placed the company on its "Do

Not Refer List."  See 2d Am. Compl., ¶ 2.  Placement on this list meant that DDS would not

refer any new clients to New Vision.

New Vision was then given several months to correct its deficiencies; in November 2012,

however, it failed its follow-up review.  See Do Not Refer List at  4; see also New Vision-OAH,

No. 2013-DHCF-175, at 8-9.   The November review found that, among other persistent PCR

shortcomings, New Vision had failed again to meet five mandatory organizational indicators.

See New Vision-OAH, No. 2013-DHCF-175, at 8-9.   Ultimately, on appeal three of these

findings were upheld: that New Vision did not have an incident-management policy meeting

_____

[1]The PCR monitors compliance with the requirements of the Medicaid waiver and DDS's policies and guidelines.
New Vision-OAH, No. 2013-DHCF-175, at 4-5.   To evaluate compliance, DDS has developed a set of indicators,
some of which are deemed mandatory, requiring a score of 100% to pass; because they "look at critical areas of
provider's services and systems . . . [they are] the most significant indicators of the quality of provider's service
delivery system."  Id. at 6 (quoting Provider Certification Review Policy effective March 1, 2012, at 8).

DDS requirements, that it similarly lacked a policy for tracking and trending such incidents, and that it failed to track participants' progress toward their goals. See id. at 16-19, 20, 24.

In December 2012, DDS notified New Vision that, because of its persistent failures, DDS would recommend to DHCF the termination of New Vision's Provider Agreement. See Revised Notice at 1. Within days of being notified, New Vision filed an appeal of the August PCR's findings. See 2d Am. Compl., ¶ 12. With that appeal still pending, DHCF reviewed the information from DDS and notified New Vision in February 2013 that it intended to terminate the agreement. See Revised Notice at 2. At that time New Vision was also given the opportunity to submit its own documentation to DHCF in response to the notice of intent to terminate. See id. Upon review of the supplementary documentation, DHCF was unswayed and issued a notice of proposed termination. See id. Several days after the termination's effective date, a New Vision staff member contacted DHCF to say they had only just received the notice. See id. DHCF then issued a revised notice, pushing back the termination date to June 2013, so as to provide New Vision the opportunity for appeal. See id.

The termination, which would exclude New Vision from the waiver program and bar reapplication for one year, was slated to take effect on June 28, 2013, but was stayed while New Vision appealed the August 2012 PCR's findings to OAH. See id.; see also New Vision-OAH, No. 2013-DHCF-175, at 8-9. During the pendency of its appeal, New Vision has failed three follow-up PCRs on June 28, 2013; October 25, 2013; and January 27-29, 2014. See Do Not Refer List at 4.

Although the stay was in place, Plaintiffs allege that on July 15, 2013, "Defendants began attempting to remove individuals from [New Vision] via circulating unfair and misleading information regarding [New Vision], for which Mr. Price wrote to DDS (Mr. Morris) requesting that DDS immediately ceast [*sic*] this conduct because it has the effect of instigating disruptive

behavior in [New Vision] individuals." 2d Am. Compl., ¶ 12. The text of the Second Amended Complaint fails to provide any details as to what the "information" in question was or in what manner New Vision contends it was "unfair and misleading," but the passage as a whole incorporates by reference a series of emails between the parties. See TRO Mot., Exhs. A-K. The emails indicate that Price took issue with a DDS case manager's informing participants that New Vision might close. See TRO Mot., Exh. A (Price/Morris Emails, July 15, 2013) at 1. Defendant Morris replied:

> DDA notifies individuals when waiver providers fail the provider certification review, but that notification is not a request nor demand on DDA's part that individuals discontinue the use of the provider. It is . . . an individual's choice if h/she [*sic*] would like to continue to receive services from [a] waiver provider.

Id. Plaintiffs vigorously object to this disclosure before the resolution of their administrative appeal. See 2d Am. Compl., ¶ 15. They claim that these actions led to the "removal" of two individuals from New Vision's program who had never previously indicated a desire to leave. Id., ¶¶ 15-16.

During the pendency of their OAH appeal, Plaintiffs also filed this suit which enumerates a congeries of counts, including violations of the Age Discrimination in Employment Act, 29 U.S.C. § 623, claims under 42 U.S.C. § 1983 for due-process violations, violations of the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, breach of contract, and intentional infliction of emotional distress. 2d Am. Compl., ¶¶ 32-53.

The Complaint alleges that as a result of Defendants' actions, Price has suffered two strokes, id., ¶ 4, and three heart attacks. Id., ¶¶ 40, 45. In addition, Plaintiffs allege "irreparable pecuniary and injury including, a deprivation of its civil rights and rights to equal waiver services opportunities regardless of national origin and age, a deprivation of its to the provision of services in D.C., as well as economic loss, humiliation, embarrassment and emotional distress, as

well as being deprived of Due Process [*sic*]."  2d Am. Compl., ¶ 30.

For these transgressions, their Prayer for Relief requests: (a) a declaratory judgment finding the District in violation of the aforementioned statutes, (b) a preliminary and permanent injunction (the request for which was supposed to be withdrawn according to a Minute Order dated December 20, 2013) requiring the District to cease PCR reviews of New Vision and "return individuals LW and EC to New Vision immediately," (c) compensatory damages of $30,000,000, (d) reasonable attorney fees and costs, and (e) other equitable relief as deemed appropriate by the Court.  Id., ¶ 54.

C.     Procedural Background

This litigation has had a brief yet vigorous run before the Court.  To quickly recap, on December 16, 2013, Plaintiffs filed the original Complaint, see ECF No. 1, and a contemporaneous Motion for a Temporary Restraining Order.  See ECF No. 2.  After expedited briefing by both sides, the Court denied the TRO during a hearing on December 20.  See Minute Order, Dec. 20, 2013.  Plaintiffs responded by filing the First Amended Complaint on January 22, 2014.  See ECF No. 8.  On February 12, Defendants filed the instant Motion to Dismiss.  See ECF No. 10.  While that Motion was still pending, on April 22 Plaintiffs filed a Motion for Leave to File a Second Amended Complaint.  See ECF No. 15 & Exh. A (Second Amended Complaint).  Defendants have opposed, arguing that amendment is futile.  See ECF No. 17. Plaintiffs then filed a second TRO application, see ECF No. 20, which the Court denied at a hearing on June 20.

II.     **Legal Standard**

A.     Rule 15(a)(2)

A plaintiff may amend his complaint once as a matter of course within 21 days of serving it or within 21 days of the filing of a responsive pleading.  Fed. R. Civ. P. 15(a)(1).  Otherwise,

the plaintiff must seek consent from the defendant or leave from the Court. The latter "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). In deciding whether to grant leave to file an amended complaint, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962). In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996). Furthermore, under Rule 15, "the non-movant generally carries the burden in persuading the court to deny leave to amend." Nwachukwu v. Karl, 222 F.R.D. 208, 211 (D.D.C. 2004).

It is clear, however, that amendment should not be permitted if it would be futile. In other words, if the proposed amendment would still render the complaint deficient, courts need not grant leave. See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss.") (citing Forman, 371 U.S. at 182, for proposition that "'futility of amendment' is permissible justification for denying Rule 15(a) motion"); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss."). Thus, to gauge the futility of the amendment, the Court "must assess the proposed amendments under the same standard as would be applied to a motion to dismiss," which is prescribed by Rule 12(b)(6). Oladokun v. Correctional Treatment Facility, No. 13-358, 2013 WL 6147940, at *3 (D.D.C. Nov. 22, 2013).

B.     Rule 12(b)(6)

Defendants seek dismissal of this action under Rules 12(b)(6) for failure to state a claim
and 12(b)(1) for lack of subject-matter jurisdiction.  See Mot. at 1.  Because Plaintiffs concede
that Price does not have standing and thus waive the jurisdictional arguments, the Court will
consider only the 12(b)(6) issues that remain in contention.

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a
claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the
Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the
benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air
Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d
605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v.
FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose
a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and he
thus must be given every favorable inference that may be drawn from the allegations of fact.
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

A complaint need only contain "a short and plain statement of the claim showing that the
pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although "detailed factual allegations" are
not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  A plaintiff
must put forth "factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  Id.  The Court need not accept as true "a legal
conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in
the complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting

Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).  Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 555 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 556.

Plaintiffs repeatedly claim in their Opposition and Surreply that Defendants have converted their Motion to Dismiss into a Motion for Summary Judgment by appending a document to their Motion that is outside of the "four corners" of the Complaint.  It is true that where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).  In evaluating the sufficiency of a complaint, under Rule 12(b)(6), however, courts may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  "Documents that are referenced in, or are an integral part of, the complaint are deemed not 'outside the pleadings'" for purposes of a motion to dismiss for failure to state a claim.  Norris v. Salazar, 885 F. Supp. 2d 402, 407 n.9 (D.D.C. 2012).  This includes documents "appended to [a motion to dismiss] and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a plaintiff's claim.  Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir.  2004).  Further, "it is well established that courts 'are allowed to take judicial notice of matters in the general public record, including records and reports of administrative bodies and records of prior litigation'  without triggering the conversion requirement."  Does I through III v. District of Columbia, 238 F. Supp. 2d 212, 216 (D.D.C. 2002) (quoting Black v. Arthur, 18 F. Supp. 2d 1127, 1131 (D. Or. 1998));

accord Am. Farm Bureau v. EPA, 121 F. Supp. 2d 84, 106 (D.D.C. 2000).  Despite Plaintiffs'

contentions, the Court is satisfied that the documents under its consideration conform to these

requirements, including those provided by Defendants.  The Court, accordingly, declines to

convert the Motion into one for summary judgment and will proceed with its analysis under the

Rule 12(b)(6) standard.

## III.    Analysis

As the Court will consider Plaintiffs' proposed Second Amended Complaint as the

operative pleading here, it may combine its analysis of Defendants' Motion to Dismiss the First

Amended Complaint and Plaintiffs' Motion for Leave to File the Second Amended Complaint.

Defendants raise numerous arguments in their Motion to Dismiss, and Plaintiffs forfeit two:

Price's lack of standing and the qualified immunity of the individual Defendants.  After a brief

discussion of these concessions, the Court will separately analyze New Vision's ADEA and §

1983 claims.  It then concludes by addressing its jurisdiction over the remaining state claims.

### A.    Arguments Conceded by Plaintiffs

In response to Defendants' 38-page Motion to Dismiss that offered more than a dozen

substantive arguments, Plaintiffs filed a 6-page Opposition that entirely omitted any discussion

of most issues.  The Court nonetheless permitted them to file a Surreply, in which they persisted

in ignoring several of Defendants' key points.

 "It is well-established in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, the court may

treat those arguments that the plaintiff failed to address as conceded."  Shaw v. District of

Columbia, 825 F. Supp. 2d 173, 177 (D.D.C. 2011) (internal quotation marks omitted); see also

FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997); Hopkins v. Women's Div., Gen. Bd. of

Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002).  This is because "[j]udges are not

expected to be mindreaders[;] . . a litigant has the obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990)).

The Court, accordingly, treats Defendants' uncontested arguments as conceded. First, Plaintiffs have not bothered to refute the point that Price lacks standing to pursue claims on his own behalf, separate from New Vision, which is the provider under the District contract. Because of this, the Court will consider the claims as asserted by the entity only. Additionally, Plaintiffs never addressed the argument that the individual Defendants – DDS employees Anderson and Moses – have qualified immunity from § 1983 claims. The Court will treat these as conceded as well and dismiss all § 1983 claims against them. With these concessions established, the Court now turns to the merits of the arguments in dispute.[2]

B.      ADEA

Not only have Plaintiffs failed to contest Price's lack of standing generally, but at the TRO hearing on June 20, 2014, they also conceded that New Vision, as a corporate entity, cannot assert a claim for employment discrimination under the ADEA. The Court could, consequently, dismiss this claim out of hand. But even if either party did have standing, such an action cannot survive because Plaintiffs are independent contractors, not District employees.

The ADEA provides protection to individuals over 40 years old, 29 U.S.C. § 631(a), by making it unlawful for an employer to discriminate on the basis of age when making employment decisions. Id. § 623(a)(1). It explains that "[t]he term 'employee' means an individual employed by any employer." Id. § 630(f). And then, to clarify any lingering ambiguity from that not-terribly-helpful definition, it explains that "[t]he term 'employer' means a person engaged in an industry affecting commerce," subject to certain practical limitations, and

---

[2] Given the merits discussion below, the Court notes that even if Plaintiffs had not forfeited these arguments, they would not have prevailed on them.

"any agent of such a person." § 630(b). As the Supreme Court has noted, this "surely qualifies as a mere 'nominal definition' that is 'completely circular and explains nothing.'" <u>Clackamas Gastroenterology Assocs. v. Wells</u>, 538 U.S. 440, 444 (2003) (assessing identical definition of "employee" in Americans with Disabilities Act, 42 U.S.C. § 12111(4), and quoting <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323 (1992) (assessing definition of employee in Employee Retirement Income Security Act of 1974)). While <u>Clackamas</u> was an ADA case, the Court gave a nod to an identical problem in the language of the ADEA. <u>See</u> <u>Clackamas</u>, at 444 n.3. In these contexts, whether an individual is an employee should be determined according to common-law principles of agency, <u>see</u> <u>id.</u> at 448, which the trial court can then apply to the facts established by the pleadings.

As its name suggests, the ADEA is intended to cover employees, not independent contractors, <u>see</u> <u>Spirides v. Reinhardt</u>, 613 F.2d 826, 829 (D.C. Cir. 1979) (addressing identical covered persons provision in Title VII), and there is little dispute that Plaintiffs are not actually District employees. A nominal independent contractor, however, may sometimes be considered an employee for ADEA purposes if warranted by the "economic realities" of the relationship between the parties. <u>Id.</u> at 831-32. To determine if an individual qualifies as an employee, a court should look to the level of control a defendant exerted over the "means and manner" of the plaintiff's work, rather than the formal title affixed to the relationship. <u>See</u> <u>id.</u> This entails an evaluation of "the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved." <u>Redd v. Summers</u>, 232 F.3d 933, 938 (D.C. Cir. 2000) (quoting <u>Spirides</u>, 613 F.2d at 831-32). While this "common-law element of control is the principal guidepost" in the analysis, there are other factors relevant to the determination. <u>Clackamas</u>, 538 U.S. at 448. Other factors meriting consideration include:

> (1) the kind of occupation, with reference to whether the work
> usually is done under the direction of a supervisor or is done by a

> specialist without supervision; (2) the skill required in the
> particular occupation; (3) whether the "employer" or the individual
> in question furnishes the equipment used and the place of work; (4)
> the length of time during which the individual has worked; (5) the
> method of payment, whether by time or by the job; (6) the manner
> in which the work relationship is terminated; *i.e.*, by one or both
> parties, with or without notice and explanation; (7) whether annual
> leave is afforded; (8) whether the work is an integral part of the
> business of the "employer"; (9) whether the worker accumulates
> retirement benefits; (10) whether the "employer" pays social
> security taxes; and (11) the intention of the parties.

Redd, 232 F.3d at 939 (quoting Spirides, 613 F.2d at 832).

In this case, New Vision repeatedly asserts that it is treated as a District employee, see 2d Am. Compl., ¶¶ 7, 9, 10, 11, but then supports that assertion by alleging only that the District "as the municipal government, along with its employees, have the authority to hire, fire, and discipline . . . including Plaintiff herein." Id., ¶ 10. As noted above, the mere ability to be hired, fired, or disciplined is not the legal standard for an employee; the proper consideration is multifaceted but primarily based on the extent of control exercised over the "means and manner" of a person's work. See Redd, 232 F.3d at 938. Plaintiffs, however, never allege day-to-day oversight by the District, any specific direction as to how to complete daily tasks, the power to assign work to Plaintiffs, or any facts related to ten of the eleven factors enumerated above, save the ability to terminate employment. Because the facts alleged in the Second Amended Complaint are insufficient to support Plaintiffs' theory that New Vision is an employee, the Court could end its analysis here, finding that they have failed to state a claim under the ADEA.

New Vision, nonetheless, urges the Court to look beyond the Complaint. In Plaintiffs' Opposition, they make additional factual allegations about the specificity required by the PCR that could have been helpful in demonstrating an employment relationship, see Opp. at 5, but they chose not to incorporate the information into the proposed Second Amended Complaint. The issue before the Court is the sufficiency of the pleadings, which cannot be established by

facts that are not alleged in the Complaint or in the already-numerous documents Plaintiffs have incorporated by reference.

Even if the Court could consider such facts, however, the Second Amended Complaint would still be deficient. The additional allegations essentially center upon the premise that the District controls the means and manner of New Vision's work through the PCR, which, Plaintiffs allege, imposes highly specific requirements on providers. See Opp. at 5. The PCR, however, is a way of regulating Medicaid service providers. See generally D.C. Mun. Regs. tit. 29, chs. 13, 19. No matter how exacting the regulatory burden on an industry, this does not render an agency charged with ensuring industry compliance an employer for purposes of the ADEA. See, e.g., Camacho v. Puerto Rico Ports Auth., 369 F.3d 570, 572 (1st Cir. 2004) ("[T]he statutory power to license and regulate harbor pilots does not imbue the [agency] with the level of control necessary to make it their employer for ADEA purposes."); Cornish v. Dudas, 715 F. Supp. 2d 56, 64 (D.D.C. 2010) (finding a patent attorney is not an employee of the U.S. Patent and Trademark Office). The District's regulatory authority, therefore, cannot by itself demonstrate an employment relationship.

New Vision's most detailed ADEA arguments pertain to the issue of independent contractors, but those miss the mark entirely. While the point raised by Defendants is that Plaintiffs are independent contractors and not District employees – and thus cannot recover under the ADEA – New Vision responds that the people administering the PCR are also independent contractors. See Opp. at 5; Surreply at 3, 5-6. This is a non-sequitur. New Vision seems to have conflated the ADEA issue with that of municipal liability, which could depend on the status of those making decisions on the District's behalf. In any event, arguments about the District's liability for the acts of the individuals who conducted the PCR review are entirely irrelevant to the ADEA claim. Only the status of Plaintiffs is relevant.

Finally, the Court notes that Count I, "Violation of the Age Discrimination in Employment Act," curiously also alleges that "[t]he District' [*sic*] actions as described discriminate against Plaintiff . . . in further violation of 42 U.S.C. 1983 [*sic*] for national origin." 2d Am. Compl., ¶ 32. Plaintiffs, however, never allege Price's national origin or otherwise elaborate on this claim, which the Court infers was erroneously cut and pasted from another pleading. Because "[j]udges are not expected to be mindreaders" and these litigants have not fulfilled their "obligation to spell out [their] arguments squarely and distinctly," they must now "forever hold [their] peace." Schneider, 412 F.3d at 200 n.1. The Court, therefore, will dismiss Count I.

C.      § 1983 Due-Process Claims

Plaintiff New Vision next asserts a claim under 42 U.S.C. § 1983, vaguely alleging that District officials violated its constitutional rights. The muddled allegations are an amalgam of both disparate legal theories and distinct factual scenarios. Specifically, Count IV of the Second Amended Complaint asserts that "[t]he U.S. Constitution, pursuant to the Fifth Amendment, secures that the public's and Plaintiff's right to due process and be free [*sic*] from civil judgments based on inaccurate or improper unreliable evidence manufacture [*sic*] by District employees who were improperly overseen, trained, and controlled in specifically how they carry out their functions. These rights were all violated." 2d Am. Compl., ¶ 36. Though nearly impossible to follow, it appears that New Vision is bringing a claim for a violation of its right to either substantive or procedural due process, although it never acknowledges the distinction. The Court will nonetheless give Plaintiff the benefit of the doubt and turn to an evaluation of these claims within the § 1983 framework.

Section 1983 allows a party to bring a civil suit against state officials acting under color of law for violations of his constitutional rights. A § 1983 analysis is a two-step inquiry. First,

the Court must determine whether the Complaint states a claim for a predicate constitutional violation.  See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 817 (1985)).  Second, it must decide, where a plaintiff is pursuing municipal liability, whether the Complaint adequately states that a custom or policy of the municipality caused the violation.  See id., 503 U.S. at 120; see also Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).

Assuming that New Vision does mean to bring a Fifth Amendment challenge – which its counsel affirmed orally at the second TRO hearing – this is its predicate constitutional violation. The Due Process Clause of that Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  The courts have interpreted the rights secured by the Due Process Clause to exist in two permutations: "procedural" and "substantive." Zinermon v. Burch, 494 U.S. 113, 125 (1990).  The Court will address each in turn.

### 1.  *Procedural Due Process*

As an initial matter, it is hard for the Court to countenance an action for deprivation of procedural due process where New Vision has yet to even exhaust the process provided by the District.  While exhaustion is not generally required for § 1983 claims, "'[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.'"  English v. District of Columbia, 815 F. Supp. 2d 254, 267 (D.D.C. 2011) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)); see also McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995); Riggins v. Board of Regents, 790 F.2d 707, 711-12 (8th Cir. 1986); ABA Inc. v. District of Columbia,  No. 14-550, 2014 WL 1863944, at *14 (D.D.C. May 9, 2014).  Here, New Vision may still appeal OAH's ruling to the District of Columbia Court of Appeals, which, at the June 20 TRO hearing, Plaintiff's counsel indicated that it planned to do.  It has thus engaged in the process provided by the District.  In

any event, regardless of the exhaustion requirement, since New Vision has not sufficiently alleged a deprivation of due process, the Court will move on to address the merits of Plaintiff's claims.

To state a claim for the denial of procedural due process, a plaintiff must allege that the government deprived her of a "'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'" Roberts v. United States, 741 F.3d 152, 161 (D.C. Cir. 2014) (alteration in original) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). This formulation poses three questions: (1) Is an interest in life, liberty, or property implicated? (2) Has there been a deprivation? (3) Was it done without due process of law? See Erwin Chemerinsky, Constitutional Law § 7.1 at 561 (4th ed. 2011).

"As the Supreme Court has repeatedly stated, 'the range of interests protected by procedural due process is not infinite.'" Gen. Elec. Co. v. Jackson, 610 F.3d 110, 119 (D.C. Cir. 2010) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564 (1972)). To adhere to this narrow principle, when considering a due-process challenge, "[t]he first inquiry . . . is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (citations omitted). Without a "cognizable liberty or property interest," Hettinga v. United States, 677 F.3d 471, 480 (D.C. Cir. 2012), a plaintiff cannot state a claim for deprivation of due process. This stems from the principle that "[p]rocess is not an end in itself"; rather, "[i]ts constitutional purpose is to protect a substantive interest." Roberts, 741 F.3d at 161 (quoting Olim v. Wakinekona, 461 U.S. 238, 250 (1983)). Further, "it is not enough that one has 'an abstract need or desire'" for the substantive interest; "to merit due process protection, '[h]e must . . . have a legitimate claim for entitlement to it.'" Gen. Elec. Co., 610 F.3d at 119 (quoting Roth, 408 U.S. at 577).

The Court can discern four conceivable claims here: (a) a generalized grievance that New Vision was deprived of process itself, (b) deprivation of a property interest in the provision of fitness services, (c) deprivation of New Vision's liberty interest in its reputation, effected by statements District employees made to New Vision clients, and (d) deprivation of property and liberty interests in New Vision's Provider Agreement. The Court looks at each alleged deprivation in turn.

The most curious (and circular) of Plaintiff's procedural-due-process allegations is that, at times, it seems to claim that the District's failure to provide due process has deprived it of the right to due process. See 2d Am. Compl., ¶¶ 2, 30. As the D.C. Circuit recently highlighted, process itself is not a substantive interest for which deprivation is actionable under the doctrine of procedural due process. See Roberts, 741 F.3d at 161-62. This cannot, therefore, be the "legitimate claim of entitlement" to which New Vision can anchor its suit.

Before turning to the other three allegations, the Court must now consider what property interests Medicaid providers do possess. New Vision's relationship with the District is defined by its Provider Agreement, a contract allowing for direct reimbursement from the District for services New Vision renders to Medicaid beneficiaries. See DDS, Waiver Provider Enrollment Application Package – Waiver Provider Agreement 21-28 http://goo.gl/MECcE6 (last visited July 1, 2014). The Supreme Court "has never held that government contracts for goods and services create property interests protected by due process." 2 Richard J. Pierce Jr., Administrative Law Treatise 764 (5th ed. 2010). Outside of the employment context, courts have resisted application of due-process principles to government contracts because "[w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." Id.; see, e.g., S & D Maintenance Co. v. Goldin, 844

F.2d 962, 966 (2d Cir. 1988) ("An interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection."); Suburban Mortg. Assocs. v. Dep't of Housing & Urban Dev., 480 F.3d 1116, 1128 (Fed. Cir. 2007) ("A claim that a government agency has violated a party's right to due process by refusing performance under a contract is substantively indistinguishable from a breach of contract claim."); Roth v. King, 449 F.3d 1272, 1284 (D.C. Cir. 2006) (holding that there is no valid property right for lawyers previously serving as public defenders to continue doing so); Redondo-Borges v. HUD, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); Bernadino Physicians Services v. County of San Bernadino, 825 F.2d 1404, 1409-10 (9th Cir. 1987) ("it is [difficult] to extend [] constitutional protection without subsuming the entire state law of public contracts"); Jones & Associates, Inc. v. District of Columbia, 797 F. Supp. 2d 129, 136 (D.D.C. 2011); LG Elec. U.S.A., Inc. v. Dep't of Energy, 679 F. Supp. 2d 18, 34 (D.D.C. 2010).

Courts have held, however, that decertification as a qualified Medicaid provider implicates a protected property interest and that total debarment from government contracting implicates a corporation's protected liberty interest. See ABA, 2014 WL 1863944, at *8 (citing Trifax Corp. v. District of Columbia, 314 F.3d 641, 643 (D.C. Cir. 2003); Patchogue Nursing Ctr. v. Bowen, 797 F.2d 1137, 1144-45 (2d Cir. 1986)); see also Vencor Nursing Centers v. Shalala, 63 F. Supp. 2d 1, 10 (D.D.C. 1999); Cleanmaster Industries Inc. v. Shewry, 491 F. Supp. 2d 937, 943 (C.D. Cal. 2007). A provider's property interest in Medicaid participation is nonetheless only triggered when it is decertified, its provider number is terminated, and it is correspondingly terminated from the program. See ABA, 2014 WL 1863944, at *8-9 (holding temporary suspension pursuant to credible allegation of fraud does not trigger due process

protections).  Providers, furthermore, have no property interest in Medicaid payments.  See, e.g., ABA, 2014 WL 1863944, at *9 ("there is no constitutional right to receive Medicaid payments"); Guzman v. Shewry, 552 F.3d 941, 950 (9th Cir. 2009); Border Area Mental Health Services Inc. v. Squier, No. 13-0613, at 7-8 (D.N.M. July 25, 2013) appeal dismissed, 524 Fed. Appx. 387 (10th Cir. 2013).

A Medicaid provider's liberty interest is similarly narrow – it "is not implicated when a contractor is not completely cut off from doing business with the government.  In such circumstances, the contractor 'fail[s] to show anything remotely close' to the preclusion necessary to infringe a constitutionally protected interest."  ABA, 2014 WL 1863944, at *9 (citing Trifax, 314 F.3d at 644-45; Advanced Mgmt. Tech., Inc. v. FAA, 211 F.3d 633, 636 (D.C. Cir. 2000)) (emphasis added) (alteration in original).  With these principles in hand, the Court now turns to the allegations leveled by New Vision, beginning with the end of its fitness program.

In 2009, having provided vocational services through the HCBS waiver for several years, New Vision was authorized to expand its service offerings to include fitness training for some of its clients.  See 2d Am. Compl., ¶¶ 7, 27; see also Price Aff. at 1.  New Vision specifically alleges that it provided this fitness training under the same provider number and provider agreement as its vocational services.  See Price Aff. at 1-2.  But in September 2011, New Vision alleges, its fitness services were discontinued for reasons and in a manner that are difficult to discern from the Complaint.  See 2d Am. Compl., ¶¶ 27-29.

Although it is not entirely clear what did happen in 2011, it is clear what did not happen.  First, as mentioned above, neither New Vision's provider number nor its provider agreement was terminated.  See Price Aff. at 1-2.  It is undisputed, furthermore, that after 2011 New Vision was allowed to continue providing other Medicaid services with that same provider number.  See id.

In other words, at that time New Vision was <u>not</u> terminated from the Medicaid program. It is also clear that New Vision was not debarred or broadly precluded from contracting with the District. Instead, it continued providing other Medicaid services to a number of clients well beyond September 2011. <u>See generally</u> 2d Am. Compl., <u>passim</u>. Plaintiff's complaints about the demise of its fitness program have not, accordingly, alleged one of the protected interests afforded to Medicaid providers under due-process jurisprudence.

Plaintiff also claims that the District drove two individuals, "L.W." and "E.C.," away from New Vision's program, and it assigns significance to the fact that "neither LW nor EC [*sic*] ever noted nor mentioned any desire to leave New Vision, and Defendants have not and cannot produce any such evidence." <u>Id.</u>, ¶¶ 15-16. The Court preliminarily notes that the District patently does not have the power to direct where, among qualified providers, HCBS waiver beneficiaries seek treatment. <u>See</u> <u>Planned Parenthood v. Comm'r of the Ind. State Dp't of Health</u>, 699 F.3d 962, 974 (7th Cir. 2012) ("<u>any</u> Medicaid-eligible person may obtain medical assistance from <u>any</u> institution, agency, or person qualified to perform that service"). This right, belonging to beneficiaries, is secured by the Medicaid program's strict freedom-of-choice provision, which allows them to seek treatment from any participating provider. <u>See</u> 42 U.S.C. § 1396a(a)(23) ("[A]ny individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required.").

The allegation regarding L.W. and E.C. might be better read as asserting a liberty interest in New Vision's reputation, damage to which, when accompanied by a corresponding tangible alteration of status, may be actionable under the so-called "reputation-plus" theory. New Vision asserts that these two participants left the program when DDS spread "unfair and misleading information," 2d Am. Compl., ¶ 12, which, apparently, refers to disclosure of the impending

termination of New Vision's Provider Agreement.  <u>See</u> Price/Morris Emails, July 15, 2013, at 1.

To the extent it alleges this infringed on a protected liberty interest in New Vision's reputation,

purely reputational damage does not qualify for due-process protection.  <u>See</u> <u>Trifax</u>, 314 F.3d at

643 (citing <u>Siegert v. Gilley</u>, 500 U.S. 226, 234 (1991); <u>Paul v. Davis</u>, 424 U.S. 693, 697

(1976)).  Yet, under the reputation-plus test a protected liberty interest may be implicated if "the

Government effectively bars a contractor from virtually all Government work due to charges that

the contractor lacks honesty or integrity."  <u>Trifax</u>, 314 F.3d at 644 (quoting <u>Old Dominion Dairy</u>

<u>Products Inc. v. Sec'y of Defense</u>, 631 F.2d 953, 955-56 (D.C. Cir. 1980)).

 Plaintiff's allegations fail the reputation-plus test, however, for two reasons.  First,

statements that New Vision would close or even that it had failed the PCR do not impugn its

reputation for honesty or integrity.  <u>See</u> <u>Hutchinson v. CIA</u>, 393 F.3d 226, 231 (D.C. Cir. 2005)

(finding statement regarding unsatisfactory performance "'does not carry with it the sort of

opprobrium sufficient to constitute a deprivation of liberty'") (quoting <u>Harrison v. Bowen</u>, 815

F.2d 1505, 1518 (D.C. Cir. 1987)).  Second, it has "failed to show anything remotely close to

broad preclusion," <u>Trifax</u>, 314 F.3d at 644 (internal quotation marks omitted), when it only

claims the loss of two clients from the program.

 Finally, the Court arrives at the only alleged action for which process may be due: the

termination of New Vision's Provider Agreement.  On this count, New Vision argues:

> In the instant matter it is beyond reasonable argument that [New
> Vision] has a significant property interest at stake here.  It appears
> clear that [New Vision] has made clear that its license to provide
> services to individuals with developmental and intellectual
> disabilities is premised on its status as a certified licensed
> Medicaid Waiver Provider."

Opp. at 3.  Plaintiff then, curiously, cites to <u>Bender v. Dudas</u>, No. 04-1301, 2006 WL 89831, at

*15 (D.D.C. Jan. 13, 2006), which says no such thing.  Regardless, a quick survey of the relevant

caselaw reveals authority tending to support that proposition.  <u>See, e.g.</u>, <u>Patchogue</u>, 797 F.2d at

1144-45 ("Health care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs.") (citation omitted); ABA, 2014 WL 1863944, at *9; but see, e.g., River Nile Invalid Coach & Ambulance, Inc. v. Velez, 601 F. Supp. 2d 609, 618 (D.N.J. 2009). As the District's action would revoke New Vision's Medicaid license and impose a one-year bar on reapplication to the program, see Proposed Notice at 1-2, this may qualify.

Assuming *arguendo* that New Vision has alleged infringement of a protected interest, it must still allege that this deprivation occurred without due process, which "grants [an] aggrieved party the opportunity to present his case and have its merits fairly judged." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982). This is where the claim founders. New Vision does not, because it cannot, complain that it was not afforded adequate process in the termination proceedings; the record plainly demonstrates that it was given the "full panoply of due process protections." Sloan v. Dep't of Hous. & Urban Dev., 231 F.3d 10, 19 (D.C. Cir. 2000). New Vision had several opportunities to informally resolve its problems before termination, including a follow-up PCR after its initial failure, the ability to submit corrective policies to the agency, and the opportunity to present evidence to DHCF before termination. See Proposed Notice at 1; see also Patchogue, 797 F.2d at 1144 (holding informal process is sufficient because Medicaid "[p]roviders are not entitled . . . under constitutional due process standards to a full administrative hearing prior to termination of their provider agreement"); see also GOS Operator, LLC v. Sebelius, 843 F. Supp. 2d 1218, 1233-34 (S.D. Ala. 2012) (collecting cases). During this time, "[New Vision] was fully capable of communicating its views to the decisionmakers and was accorded numerous opportunities over a period of months to demonstrate either orally or in writing that the [termination] should not be imposed." Patchogue, 797 F.2d at 1145.

The process provided by the District's Medicaid scheme, however, does not stop with the informal procedures.  After the DHCF decision, the termination was stayed while New Vision appealed to OAH; after the issuance of a decision by OAH, it could request a revision by the ALJ, and, finally, it still has the option of appealing the OAH ruling to the District of Columbia Court of Appeals.  See New Vision-OAH, No. 2013-DHCF-175, at 28.  In fact, at the second TRO hearing, Plaintiff indicated it would pursue this last option.  So far, none of these proceedings has gone Plaintiff's way, but an unfavorable outcome is not a violation of due process.  Put more bluntly, Plaintiff's beef is with the result, not the process.  Like in Patchogue, "[t]he process accorded herein is fully adequate and sufficiently protects [any] private interest." 797 F.2d at 1145.  Because New Vision has, accordingly, failed to state a procedural-due-process claim, the Court may now move on to its substantive counterpart.

2.     *Substantive Due Process*

It is characteristically unclear whether New Vision is actually bringing a claim for substantive due process here.  Plaintiff never mentions the term, but because it cites several cases that do, the Court will assume that the corporation means to pursue such a theory.  Yet in doing so, New Vision alleges nothing more than the erroneous termination of its Medicaid provider agreement at the hands of poorly trained employees.  This surely does not qualify as a substantive-due-process violation.

The doctrine of substantive due process ordinarily only prohibits government "actions that in their totality are genuinely drastic," Tri County Industries, Inc. v. District of Columbia, 104 F.3d 455, 459 (D.C. Cir. 1997), because it "constrains only egregious government misconduct."  George Washington Univ. v. District of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003).  When considering whether an allegation rises to this level, a court should keep in mind the traditional "reluctan[ce] to expand the concept of substantive due process because guideposts

for responsible decision making in this unchartered area are scarce and open-ended." <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992). To ensure claims remain within these parameters, the threshold question for a violation of substantive due process is whether the actions may "be fairly said to shock the contemporary conscience." <u>Estate of Phillips</u>, 455 F.3d at 403 (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998)).

In the instant case, "careful attention to the gravamen of [Plaintiff's] complaint," <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1003 (1982), reveals that New Vision apparently alleges that District employees rejected a proposed discharge policy after only two hours' consideration. <u>See</u> 2d Am. Compl., ¶¶ 3, 17. This, New Vision contends, failed to provide an "organized person centered process" as mandated by internal DDS policies and procedures. <u>Id.</u>, ¶ 17. Plaintiff also fleetingly alleges that the District has violated its right "to be free from civil judgments based on inaccurate or improper unreliable evidence." 2d Am. Compl., ¶ 36.

On the first point, New Vision alleges that when it felt the District's current policies were causing it to lose clients, it proposed a new participant-discharge policy. <u>See</u> 2d Am. Compl., ¶ 3. It alleges that District employees then "refus[ed] to consider, utilize or even acknowledge [New Vision]'s [proposed] policy for discharge [*sic*] individuals as per DDS rules." <u>Id.</u> The Complaint, however, goes on to make clear that DDS <u>did</u> acknowledge and consider the policy, and that New Vision's true gripe is the brief, two-hour consideration it was afforded. <u>See id.</u>, ¶ 17 ("That same day . . . **in less than two (2) hours** Defendant Anderson coldly rejected [New Vision]'s proposed policies.") (emphasis in original). The act of rejecting the proposed policy after only two hours, New Vision claims, did "not provid[e] [an] organized person centered process," and failing to do so "clearly intentionally violate[d] DDS policy #POL006 and procedure #PRO011." <u>Id.</u>, ¶ 17.

At first glance these allegations seem to center upon procedure, but they properly fall under the doctrine of substantive due process because they hinge upon an employee's departure from the District's procedures, not on the inherent infirmity of those procedures. These allegations blur an already blurry line, but in our jurisprudence, "an act of 'grave unfairness' such as 'a deliberate flouting of the law that trammels significant personal or property rights,' may violate the right to 'substantive' due process." Am. Fed'n of Gov't Employees, AFL-CIO, Local 446 v. Nicholson, 475 F.3d 341, 353 (D.C. Cir. 2007) (quoting Tri County, 104 F.3d at 459). "A mere state law violation," however, "does not give rise to a substantive due process violation." Id.

Despite Plaintiff's protestations, a quick glance at policy #POL006 and procedure #PRO011 reveals that they are both patently inapplicable to the situation at hand. See TRO Mot., Exh. K (DDS #POL006 & #PRO011) at 3-8. The purpose of both is to set standards for New Vision and DDS when interacting with HCBS waiver beneficiaries – not standards for DDS interactions with service providers like New Vision. See, e.g., #POL006 at 3; #PRO011 at 6. DDS's actions, therefore, were not contrary to the proffered policies, and so this claim requires no further consideration. See Am. Fed'n of Gov't Employees, 475 F.3d at 353 ("We have held that the [action] was not unlawful, and so our discussion of the [plaintiff's] due process claim comes to an end."). Beyond their inapplicability to the situation at hand, moreover, policy #POL006 and procedure #PRO011 are both internal agency policies, not formally promulgated regulations; as such, their purported contravention "do[es] not support a claim for denial of due process." Sloan, 231 F.3d at 18 (citing Schweiker v. Hansen, 450 U.S. 785, 789 (1981); Kugel v. United States, 947 F.2d 1504, 1507 (D.C. Cir. 1991); Lynch v. U.S. Parole Comm'n, 786 F.2d 491, 497 (2d Cir. 1985)).

Further, New Vision's claim that it has a right "to be free from civil judgments based on inaccurate or improper unreliable evidence manufacture [*sic*] by district employees who were improperly overseen, trained, and controlled in specifically how they carry out their functions," 2d Am. Compl., ¶ 36, holds no water. This language appears to be taken directly from <u>Molina-Aviles v. District of Columbia</u>, 797 F. Supp. 2d 1, 3 (D.D.C. 2011), with the substitution of the word "civil" for "criminal." The problems with this allegation are twofold: first, no precedent supports the application of this principle, which is derived from <u>Napue v. People of State of Ill.</u>, 360 U.S. 264 (1959), in the civil context. Second, the Amended Complaint contains no factual allegations regarding the allegedly manufactured evidence – the Court is utterly in the dark. New Vision, accordingly, has also failed to state a claim for deprivation of its right to substantive due process.

The proposed amendments Plaintiff offers to its due-process allegations would not save them because the supplemental information only pleads facts aimed toward establishing the District's liability. <u>See</u> 2d Am. Compl., ¶¶ 44-45. Without a predicate constitutional violation, however, the issue of the District's municipal liability is moot. <u>See</u> <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120 (1992). The amendment would, therefore, be futile, and leave to amend will thus be denied. Having dispatched all of the federal claims, the Court must now turn to the question of what to do with the state-law claims Plaintiffs have also brought.

D.  <u>Remaining State-Law Claims</u>

This Court lacks independent subject-matter jurisdiction over the remaining state-law claims, and it will decline to exercise supplemental jurisdiction. Federal district courts are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction. 28 U.S.C. § 1367(a). By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] .

. . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966), quoted in Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005). When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider "judicial economy, convenience, fairness, and comity." Shekoyan, 409 F.3d at 424. When all federal claims are eliminated before trial, however, "the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in Carnegie-Mellon Univ. "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

Here, the factors weigh against retention of the case. This Court is dismissing the only federal claims against Defendants. This case has not progressed in federal court past Defendants' Motion to Dismiss, and the Court has developed no particular familiarity with the issues presented. Cf. Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (finding that district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in the case). The Court can thus conceive of no undue inconvenience or unfairness to the litigants that would result from such a decision. Finally, Plaintiffs will not be prejudiced because 28 U.S.C. § 1367(d) provides for a tolling of the statute of limitations during the period the case was here and for at least 30 days thereafter. See Shekoyan, 409 F.3d at 419 (affirming district court finding that because of this tolling, dismissal

of pendent state claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system") (citation omitted).

Alternatively, Plaintiffs plead diversity jurisdiction under 28 U.S.C. § 1332.  Alas, that assertion is flawed in several ways, discussion of only one of which is necessary for dismissal. Principally, the District of Columbia is not a <u>resident</u> of any state — it <u>is</u> a state for diversity purposes.  <u>See</u> § 1332(e).  As such, it cannot provide the diverse citizenship required under § 1332(a)(1), which confers federal jurisdiction for actions between "citizens of different States." <u>See</u> <u>Barwood Inc. v. District of Columbia</u>, 202 F.3d 290, 292 (D.C. Cir. 2000) ("the District of Columbia, like a state, is not a citizen of a state (or of itself) for diversity purposes").  In the absence of any source of jurisdiction, the Court will dismiss the state-law claims without prejudice, and Plaintiffs may bring such claims, if not barred, in the appropriate local court.  <u>See</u> <u>Jones v. D.C. Water & Sewer Auth.</u>, 922 F. Supp. 2d 37, 43 (D.D.C. 2013).

## IV.    Conclusion

For the reasons articulated herein, the Court will issue a contemporaneous Order granting Defendants' Motion and denying Plaintiffs'.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:  <u>July 7, 2014</u>